UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CARL WINFREY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case number 4:11cv0231 TCM** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Carl Winfrey (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB and SSI in December 2007, alleging he was disabled as November 17, 2005, by epilepsy, depression, and being a slow learner. (R.[1] at 101-07.) His applications were denied initially and after a hearing held in September 2009 before Administrative Law Judge (ALJ) Robert G. O'Blennis. (Id. at 10-53, 59-61, 69-78.) The

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

Appeals Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-4.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, Patricia Winfrey-Cherest, his mother, and Brenda Young, M.A., a vocational expert (VE), testified at the administrative hearing.

Plaintiff was 29 years old at the time of the hearing.  (Id. at 26.)  He lives with his mother and stepfather in a house.  (Id.)  He is right-handed.  (Id.)  He graduated from high school, but did not attend any college, vocational school, or trade school.  (Id. at 27.)

Plaintiff does not drive, and has never had a driver's license.  (Id. at 26.)

Plaintiff last worked at McDonald's.  (Id. at 27.)  He left that job after three years when he got angry at the manager.  (Id.)  He had also worked at Jack in the Box, cooking, cleaning, and working the cash register.  (Id.)  He quit that job, but does not know why.[2]  (Id. at 28.)  He had worked at Hardee's unloading food from a truck.  (Id.)  The heaviest weight he lifted was fifty pounds.  (Id. at 34.)  He saw no reason why he could not lift that weight currently.  (Id.)

Asked what happened on November 17, 2005, Plaintiff explained that he had seizures and kept on having them.  (Id. at 28.)  He was seeing a physician for the seizures and taking medication.  (Id. at 28-30.)  He has a seizure "[e]very once in a while."  (Id. at 35.)  He does not use any assistive device when walking.  (Id.)

---

[2]Ms. Winfrey-Cherest testified that Plaintiff quit one of his jobs because he had no transportation and the other job because his girlfriend asked him to quit.  (Id. at 49.)

Asked how he spends his days since he stopped working, Plaintiff testified that he takes care of his three dogs and cats. (Id. at 30-31.)  He also sweeps and mops and plays video games. (Id. at 31.)  He goes to his father's house once a week to watch wrestling. (Id. at 32.)  His mother drives him. (Id.)  He never takes public transportation. (Id.)  Sometimes, he walks to his friend's house. (Id. at 33.)  Plaintiff does not belong to any organizations, social groups, or religious groups. (Id.)  Occasionally on weekends he helps at Bingo games at Jefferson Barracks. (Id. at 33-34.)

Plaintiff gets up in the morning around 9 o'clock and goes to bed between 9:30 and 10 in the evening. (Id. at 34-35.)  He has no trouble taking care of his personal needs. (Id. at 35.)

In addition to the problem with his manager at McDonald's, Plaintiff had problems with a police office and ex-girlfriend. (Id. at 37.)

Ms. Winfrey-Cherest testified that Plaintiff had had a seizure the week before, "spac[ing] out" and "star[ing] at the wall." (Id. at 38-39.)  He did not see or hear anyone. (Id. at 39.)  She had seen Plaintiff have two or three seizures that year. (Id.)  This was at the same rate as in the past couple of years. (Id.)  She last saw him have a grand mal seizure approximately eighteen months earlier. (Id.)  He then had to go to the emergency room. (Id. at 39-40.)

She further testified that Plaintiff had been placed on probation after his altercation with the police officer three or four years earlier. (Id. at 40, 41.)

Ms. Young testified that Plaintiff's former jobs were medium, unskilled work. (Id. at 43.)  She was then asked to assume a hypothetical claimant of Plaintiff's age, education, and

- 3 -

work experience who was limited to jobs that did not require working around unprotected, dangerous heights or machinery.  (Id.)  This claimant should also avoid climbing ladders, ropes, or scaffolds and working alone around open flames or water and extreme heat or cold. (Id. at 43-44.)  This claimant was "limited to simple and/or repetitive work that did not require close interaction with the general public."  (Id. at 44.)  Ms. Young testified that Plaintiff's former janitorial work would be appropriate.  (Id.)  If Plaintiff's former work did not qualify as substantial gainful activity or as past relevant work as defined in the regulations, there were approximately 15,000 such jobs in the local economy.  (Id.)  If this claimant consistently missed one or two days of work a month, that would preclude competitive employment in unskilled jobs.  (Id.)  Or, if this claimant would be late, have to leave early, or need an additional break randomly once a week, competitive employment would be precluded.  (Id. at 45.)  If someone had trouble with one to three steps work directions, the jobs would also be eliminated.  (Id.)  A capability only for sheltered employment would be incompatible with competitive employment.  (Id.)

If, as indicated in an assessment administered by Goodwill, Plaintiff "struggled to work independently, follow complex directions, work at an appropriate speed, follow rules given to him, [and] required directions to be provided numerous times," janitorial work could be eliminated.  (Id. at 46.)

The VE further testified that there were some jobs that would have fewer steps than janitorial work, e.g., small product assembly and packaging.  (Id. at 47.)  If a claimant was unable to complete a small tools Valpar test, many of the small products assembly jobs would

be eliminated but not the packaging jobs.  (Id.)  The packaging jobs also would not be affected by a claimant's inability to complete a multi-level Valpar test.  (Id. at 48.)  A need for a lot of supervision would eliminate the packaging jobs.  (Id.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, school and medical records, and various evaluations.

When applying for DIB and SSI, Plaintiff completed a Disability Report.  (Id. at 162-69.)  He is unable to work because of epilepsy and a low intelligence quotient (IQ) because of a head injury in 1982.  (Id. at 163.)  Because of his impairments, he stopped working on November 17, 2005.  (Id.)  That was when he got fired.  (Id.)  He had had seizures at work, then his hours were cut, causing a confrontation with his boss.  (Id.)  He had graduated from high school in 1999; he had been in special education classes.  (Id. at 167.)  He completed a vocational rehabilitation program at Goodwill in 2006.  (Id. at 168.)

Plaintiff also completed a Function Report.[3]  (Id. at 141-48.)  Asked to describe his daily activities, he responded that he goes to 7Eleven to get breakfast, watches television, makes his bed, eats a sandwich, goes for a walk, eats dinner, watches television or plays a game, and goes to bed.  (Id. at 41.)  He takes care of pets; his mother helps or reminds him.  (Id. at 142.)  His medication makes him sleepy.  (Id.)  He has to be told to change clothes and shave and be reminded to bathe, care for his hair, and eat.  (Id.)  With help, he prepares

---

[3]The report sometimes refers to Plaintiff in the first person and sometimes in the third.

sandwiches or cereal once a week.  (Id. at 143.)  This takes at least two hours.  (Id.)  His impairments adversely affect his abilities to talk (he speaks very low), remember, complete tasks, concentrate, understand, follow instructions, and get along with others.  (Id. at 146.)  He does not follow written or spoken instructions very well.  (Id.)  He does not handle stress well; he gets depressed or angry.  (Id. at 147.)

Plaintiff's sister-in-law completed a Function Report on his behalf.[4]  (Id. at 132-40.)  Asked to describe his daily activities, she reported that he watches television and plays with his nephew and niece.  (Id. at 132.)  She has to tell him to change clothes and clean himself up.  (Id.)  He takes care of his pets, but has to be reminded to feed them.  (Id. at 133.)  He's been this way for twelve years.  (Id. at 132, 133.)  He forgets to change his clothes, wears clothes that are too big, and does not shower, brush his hair, or shave until he is told to.  (Id. at 133-34.)  He can make sandwiches or microwave meals, but does not use the oven or stove top.  (Id. at 134.)  He makes his own bed, takes out the trash, and picks up the yard.  (Id.)  He does not do these tasks unless encouraged.  (Id.)  His hobbies include reading, playing video games or with his dogs, and watching television.  (Id. at 136.)  He reads very slowly and gets frustrated.  (Id.)  He "can have a temper"; he does not listen very well.  (Id.)  His impairments adversely affect his abilities to understand, talk, follow instructions, complete tasks, concentrate, remember, and get along with others.  (Id. at 137.)  He mumbles when he talks, forgets to do things, gets angry, and becomes frustrated when he is unable to complete a task.

---

[4]This report, completed the same day as the one Plaintiff did, appears to be in the same handwriting as Plaintiff's.

(Id.)  He can pay attention only for a few minutes.  (Id.)  He gets confused when following instructions and needs help.  (Id.)  He can follow spoken instructions if they are repeated.  (Id.)  When stressed, he isolates himself and becomes depressed.  (Id.)  Changes in routine confuse him and, sometimes, make him angry.  (Id.)

Sixteen months later, Plaintiff's sister-in-law completed another Function Report on his behalf.  (Id. at 188-96.)  She reported that Plaintiff had been able to work until his injuries worsened.  (Id. at 189.)  Also, he had been more sociable.  (Id.)  Currently, he had no social life.  (Id. at 193.)  He had difficulty listening and concentrating.  (Id.)  He could only pay attention for short periods.  (Id.)  He could follow spoken instructions better than written but had to have them repeated.  (Id.)  When stressed, he slept a lot and became angry and violent.  (Id. at 194.)

On a Missouri Supplemental Questionnaire, Plaintiff reported that stressful environments, heat, and having to move quickly caused him to have seizures.  (Id. at 180.)  His medications caused fatigue, depression, and confusion.  (Id. at 181.)  He lived with his mother, stepfather, and stepbrother.  (Id.)  He did not do the laundry because he put too much detergent or clothes in; he did not wash dishes because he did not get them clean.  (Id. at 183.)  He was not allowed to do home repairs or to mow the lawn.  (Id.)  He had to be reminded to take a shower.  (Id. at 184.)  During the day, he ate, cleaned the house, and watched television.  (Id.)  He read slowly.  (Id.)  He watched wrestling and read wrestling magazines.  (Id.)  He could watch a two-hour movie, but sometimes got distracted.  (Id.)  He could play video games or use a computer for thirty minutes.  (Id. at 185.)  He got upset easily.  (Id. at 186.)

After the initial denial of his applications, Plaintiff competed a Disability Report - Appeal form.  (Id. at 213-19.)  There had been no changes in his impairments or any new impairments.  (Id. at 214.)

An earnings report generated pursuant to Plaintiff's applications included the years from 1999 to 2006, inclusive.  (Id. at 119.)  Plaintiff's annual earnings never exceeded $9,000.  (Id.)  His highest earnings, $8,034.43, were in 2002; his lowest, $182.83, were in 2006; his next lowest, $3,821.80, were in 2001.  (Id.)

Also before the ALJ were school and medical records for Plaintiff.

The school records begin when Plaintiff was evaluated at five years of age and in the fall semester of kindergarten.  (Id. at 310-17.)  His teacher observed that he had "very serious problems" with perseverance, an habitual inability to stay on task, giving up easily, constantly needing supervision, procrastinating, lacking spontaneous verbalization, and not participating in group activities.  (Id. at 310.)  He had serious problems in destroying his own work, resisting assignments, and laughing inappropriately.  (Id.)  His scores on the Weschler Preschool and Primary Scale of Intelligence (WPPSI) were a verbal IQ of 66, performance IQ of 85, and full scale IQ of 73.  (Id. at 310, 315.)  These scores placed him in the borderline range of intellectual functioning.  (Id. at 310.)

The following spring, he was referred for an evaluation "because of experiencing academic and behavioral difficulties in the classroom."[5]  (Id. at 303-36.)  Plaintiff had a score of 60 on the Leiter International Performance Scale, a non-verbal test of intelligence, placing

_____

[5]The birth year on the evaluation incorrectly reads 1978; Plaintiff was born in 1979.

him in the mildly retarded range of functioning.  (Id. at 307, 309.)  He had a mild articulation disorder.  (Id. at 303.)  His mother reported that he was outgoing and made friends easily.  (Id. at 306.)   His kindergarten teacher completed the Vineland Adaptive Behavior Scale: Classroom Edition and rated his language skills as extremely low compared to his same-age peers.  (Id. at 307.)  His socialization, i.e., interpersonal relationships and coping skills, were low.  (Id.)  His daily living skills were also low, but were slightly higher than the other scales. (Id.)  His speech and language skills were considered to be moderately to severely delayed. (Id. at 309.)

The following school year, an Individual Education Program (IEP) was developed for Plaintiff after he transferred from the Jefferson County School District to the St. Louis Public Schools.  (Id. at 318-22.)

The next IEP for Plaintiff is dated in the spring of 1998 when he was to graduate from high school.  (Id. at 323-36.)  His diagnosis was educable mentally handicapped.  (Id. at 323.) Plaintiff had met the requirements for graduation.  (Id. at 326.)  His Wechsler Intelligence Scale for Children – Revised (WISC-R) scores reportedly were within the mentally deficient range.[6]  (Id.)  He was described as following rules in the classroom, respecting his peers and adult authority figures, making an effort to complete assignments, and having good attendance. (Id.)  There were no concerns with his speech and language functioning.  (Id.)  His goals included moving away from home, working as a janitor, and getting involved in community activities.  (Id. at 327.)  The IEP committee determined that Plaintiff had the ability to live

_____

[6]The scores themselves are not in the record, nor is "mentally deficient" defined.

independently when he chose to do so.  (Id. at 330.)  He was assessed as having an average ability to follow oral and written directions and an above average ability to complete assignments.  (Id. at 332.)  He was also above average in his sense of personal responsibility, classroom behavior, and interpersonal relationships.  (Id.)

Plaintiff medical records begin in June 2001 when he consulted Frank Gilliam, M.D., M.P.H., at the Washington University Adult Epilepsy Center (Epilepsy Center). (Id. at 239-40.) Plaintiff reported that his "typical seizure starts with mild confusion, followed by his eyes rolling upward and sometimes vocalizations." (Id. at 239.)  He had had probable generalized tonic-clonic[7] (GTC) seizures and had had staring spells, "possibly representing absence seizures."  (Id.)  The seizure frequency was not known, but he had not had one in the past month.  (Id.)  He had been told that he is developmentally delayed.  (Id.)  On examination, Plaintiff was alert; oriented to time, person, and place; had normal attention; spoke in short sentences; and had a mildly slow voice.  (Id. at 240.)  He had a postural tremor but normal postural stability.  (Id.)  He was to undergo an electroencephalogram (EEG) to confirm whether he had idiopathic generalized epilepsy (IGE) and was started on Keppra.  (Id.)

Plaintiff returned to the Epilepsy Center in May 2002.  (Id. at 238.)  Since his last visit, he had had one probable absence seizure and that was two weeks earlier.  (Id.)  He had missed doses of his medication before the seizure.  (Id.)  He was continued on Keppra and Zonegran, both anti-epileptic drugs, and was to return in six months.  (Id.)

---

[7]A tonic-clinic seizure, also known as a grand mal seizure, is accompanied by a loss of consciousness and lasts for one to two minutes. Merck Manual of Diagnosis and Therapy, 1439 (16th ed. 1992).

Plaintiff was next seen at the Epilepsy Center in December.  (Id. at 236-37.)  He had not had any seizure activity for at least three months.  (Id. at 236.)  He had no side effects from his two medications.  (Id.)  No changes were made in his treatment regimen; he was to return in six months.  (Id.)

No changes were made in Plaintiff's medication when he was seen at the Epilepsy Center in June 2003.  (Id. at 234-35.)  It was noted that he had had no side effects from his medications and no seizures.  (Id.)  It was also noted that he was alert and oriented to time, person, and place and had normal attention.  (Id.)  Also, he had an "abnormal" intellect.  (Id.)  His voice was "mildly slow" and he spoke in short sentences.  (Id.)  He was able to read.  (Id.)

At his annual visit in June 2004 to the Epilepsy Center, Plaintiff and his mother reported that he had had three generalized seizures during the past six months.  (Id. at 232-33.)  Plaintiff also reported that he had missed a dose of medication at least twice a week.  (Id. at 232.)  Dr. Gilliam thought the seizures might be due to the missed doses and adjusted the dosage of Zonegran so it could be taken the same time as the Keppra and was less likely to be missed.  (Id.)  Although his mental status was described the same as previously, Plaintiff described symptoms of depression and, after discussing the matter with Dr. Gilliam, agreed to consider evaluation of and possible treatment for depression.  (Id.)

When Plaintiff returned to the Epilepsy Center in February 2005, he reported that he had not been taking his medications as prescribed and had recently run out of them.  (Id. at 229-31.)  He had had one seizure in the past six months that the physician, Kelly Brown, M.D., thought might be due to missed medications.  (Id. at 230.)  Dr. Brown offered to write to

Plaintiff's employer, McDonald's, to keep Plaintiff from working near the grill or fryer.  He declined.  (Id.)

The following month, on March 26, Plaintiff went to the emergency room at Barnes-Jewish Hospital (Barnes) with complaints of a migraine headache.  (Id. at 241, 245-64, 342.)  He was "speaking coherently and appropriately for [his] age."  (Id. at 251.)  A computed tomography (CT) scan of his head revealed "[h]ypoplastic right frontal sinus with mild opacification of the bilateral ethmoid air cells" and was otherwise unremarkable.  (Id. at 241, 256, 342.)  Plaintiff was discharged with instructions to take Tylenol or Ibuprofen for pain.  (Id. at 257.)

Plaintiff informed Dr. Brown when he was seen at the Epilepsy Center in February 2006 that he had had a generalized seizure in March 2005 and was missing a dose of medication at least twice a week.  (Id. at 226-28.)  She thought the seizure might be attributable to the missed medication and reviewed with him the importance of complying with his anti-epilepsy medications.  (Id. at 227.)  Also, he had had myoclonus.[8]  (Id. at 226.)  His mood was described as "mildly depressed."  (Id. at 227.)

Plaintiff was taken by ambulance to the Barnes emergency room on September 7 after having a seizure and falling.  (Id. at 341, 358-76, 377.)  A CT scan of his head revealed no acute intracranial process.  (Id. at 341, 364, 377.)  He reported that he had skipped his anti-epilepsy medication three days earlier.  (Id. at 373.)  His mother explained that he had been

---

[8]"Myoclonus refers to a quick, involuntary muscle jerk."  Mayo Clinic, Myoclonus, http://www.mayoclinic.com/health/myoclonus/DS00754 (last visited Mar. 9, 2012).

having seizures since suffering a head injury when he was three years old.  (Id.)  The physician noted that a 2001 EEG had revealed generalized epilepsy.  (Id. at 373, 376.)  Plaintiff was discharged within three hours.  (Id. at 358, 368.)

In December, Plaintiff consulted Ghassan Khoukas, M.D., about right leg pain that had begun a few days earlier and back pain when he did a "certain thing."  (Id. at 387-88, 420-21.)  He reported that his last seizure had been a few months earlier.  (Id. at 388, 421.)  Dr. Khoukas noted that Plaintiff responded slowly to questions and was not a good historian.  (Id.)  He prescribed Ibuprofen and Flexeril, a muscle relaxant, and told Plaintiff to return if he did not improve.  (Id.)

Plaintiff returned on January 17, 2007, reporting that he had been unable to buy the medications Dr. Khoukas had prescribed.  (Id. at 386, 419.)  He was advised to use over-the-counter Ibuprofen when needed.  (Id.)  Plaintiff was to return as needed.  (Id.)

Plaintiff was next seen by Dr. Brown at the Epilepsy Center in March.  (Id. at 337-39.)  He reportedly had had a GTC seizure the previous September after not taking his medications for three days.  (Id. at 337.)  He had not had any staring spells but had had myoclonus.  (Id.)  He had recently been taking his medications with the exception of occasionally missing doses.  (Id.)  Again, the importance of fully complying with his medication was discussed.  (Id. at 338.)  Dr. Brown noted that Plaintiff's low IQ contributed to his lack of employment.  (Id.)

In July, Plaintiff went by ambulance to the Barnes emergency room with complaints of abdominal pain and coughing up blood.  (Id. at 340, 343-57, 377, 379-84.)  The pain was a nine on a ten-point scale.  (Id. at 346.)  He was concerned about giving a urine sample,

- 13 -

explaining that he did not want his doctor to find out about "'all the drugs he [was] taking.'" (Id. at 344.)  Chest x-rays were normal.  (Id. at 340, 377.)  Within two hours, the pain went away.  (Id. at 344, 346.)  The attending physician concluded that the pain was an isolated incident.  (Id. at 348.)  Plaintiff was discharged within five hours.  (Id. at 354, 357.)

In March 2008, Plaintiff saw Samiya Rashid, D.O., at the Epilepsy Center.  (Id. at 411-14.)  Plaintiff reported having side effects of fatigue and poor concentration from his present regimen of Zonegran and Keppra.  (Id. at 411.)  He had recently been taking them as prescribed except for occasionally missing dosages.  (Id.)  He had not had any staring spells with inattention but had had myoclonus.  (Id.)  His mother reported that he had not had any seizures for six months.  (Id.)  Plaintiff reported feeling depressed; his mother felt that the depression was worse on increased dosages of Keppra.  (Id.)  Plaintiff also reported that he forgot to eat, bathe, or take his medication and had mood swings.  (Id. at 414.)  Dr. Rashid noted that Plaintiff appeared "significantly depressed."  (Id. at 412.)  He gave Plaintiff samples of Lexapro, an anti-depressant, prescribed Topamax, a seizure medication, and recommended that he follow up with his primary care physician or a psychiatrist for his depression.  (Id.)  Plaintiff was to follow up in six months.  (Id.)

In October, Plaintiff returned to the Epilepsy Center for his follow-up appointment with Dr. Rashid.  (Id. at 415-18.)  His medication compliance was as before.  (Id. at 415.)  His seizure frequency was described as varying from twice a month to once every eighteen months, depending on his medication compliance.  (Id.)  His depression had improved.  (Id.)  On examination, he was drowsy and uninterested in talking.  (Id. at 416.)  He was oriented to

person, place and time, had normal attention, and had a depressed affect and mood. (Id.) He "had fluent speech and followed commands with psychomotor slowing." (Id.) On a depression scale, Plaintiff reported a three – "[m]ost or all of the time (5-7 days)" - for three of the twenty symptoms: (i) he had trouble keeping his mind on what he was doing; (ii) he felt that everything he did was an effort, and (iii) he could not get "'going.'" (Id. at 418.) He reported a two – "[o]ccasionally or a moderate amount of the time (3-4 days)" – on one: he thought his life had been a failure. (Id.) He reported a one – "[s]ome or a little of the time (1-2 days)" – for four symptoms: (i) he felt that he could not shake off the blues even with help from his family and friends, (ii) he felt he was not as good as other people, (iii) he felt hopeless about the future, and (iv) he was unhappy. (Id.) He reported a zero for the remaining twelve symptoms, including having restless sleep. (Id.) He was continued on his current medication, i.e., Topamax, Keppra, and Zonegran. (Id. at 416, 417.)

In addition to the foregoing records, the ALJ had before him several evaluations of Plaintiff.

Paul W. Rexroat, Ph.D., performed a psychological evaluation of Plaintiff in October 2006. (Id. at 280-84.) Plaintiff presented with a neat appearance, appropriate dress, and generally adequate grooming. (Id. at 280.) There were no observable speech, vision, or hearing problems. (Id.) He demonstrated age-appropriate gross and fine motor skills. (Id.) His activity level was "generally slow." (Id.) He spoke little without questioning, but readily understood instructions and demonstrated an appropriate attitude and good interest and effort. (Id.) He had a methodical, orderly, and persistent approach to assessment tasks, but was

challenged by difficult items.  (Id. at 280-81.)  On the Wechsler Adult Intelligence Scale - III

(WAIS-III), Plaintiff achieved a verbal IQ of 73, a performance IQ of 74, and a full scale IQ

of 71.  (Id. at 281.)  Dr. Rexroat concluded that Plaintiff functioned in the borderline range of

intellectual functioning.  (Id. at 282.)  Plaintiff reported that his seizures seemed to be

triggered by mental and physical stress.  (Id. at 283.)  "His speech was normal, coherent, and

relevant, with no evidence of flight of ideas or loosening of associations or other abnormalities

of speech that would indicate the possible presence of a thought disorder."  (Id.)  He had

occasional mood swings; however, anxiety and depression were not problems.  (Id.)  He did

not have any problems with sleeping.  (Id.)  He was able to understand and remember simple

instructions and to sustain concentration and persistence with simple tasks.  (Id.)  He had

marked limitations in his ability to interact socially and moderate limitations in his ability to

adapt to his environment.  (Id.)  He had no friends and associated mainly with relatives.  (Id.)

His Global Assessment of Functioning (GAF) was 60.[9]  (Id. at 284.)

The following month, a Psychiatric Review Technique form (PRTF) was completed for

Plaintiff by a non-examining agency employee, listing an organic mental disorder of

borderline intellectual functioning.  (Id. at 285-96.)  This disorder resulted in Plaintiff having

---

[9]"According to the *Diagnostic and Statistical Manual of Mental Disorders* (4th Ed. Text
Revision 2000)[DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report
'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345
F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that
judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 61 and 70
indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in
social, occupational, or school functioning (e.g., occasional truancy, or theft within the household),
but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR
at 34 (emphasis omitted).

moderate limitations in the areas of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  (Id. at 293.)  It did not cause any episodes of decompensation of extended duration.  (Id.)

The same employee completed a Mental Residual Functional Capacity Assessment (MRFCA) of Plaintiff.  (Id. at 297-99.)  In the three abilities in the area of understanding and memory, Plaintiff was not significantly limited in two and was moderately limited in one, i.e., his ability to understand and remember detailed instructions.  (Id. at 297.)  In the area of sustained concentration and persistence, Plaintiff was not significantly limited in four of the seven abilities and was moderately limited in three, i.e., his abilities to (i) carry out detailed instructions, (ii) maintain attention and concentration for extended periods, and (iii) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace.  (Id. at 297-98.)  In the area of social interaction, Plaintiff was not significantly limited in three of the five abilities and had moderate limitations in his abilities to (i) interact appropriately with the general public and (ii) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Id. at 298.) In the area of adaptation, he was not significantly limited in any of the four abilities listed. (Id.)

In March 2007, Plaintiff underwent a vocational evaluation at Goodwill.  (Id. at 203-09.)  It was concluded that a sheltered workshop environment was the most beneficial for Plaintiff.  (Id. at 203.)  It was noted that Plaintiff had had a seizure the week before and took his medications when he felt like it.  (Id.)  Relevant to his employment possibilities were, inter

alia, job retention and a history of medication noncompliance. (Id.) It was also noted that Plaintiff had been fired from his last two jobs. (Id.) He "struggled to work at an appropriate speed," to understand directions, and to arrive when scheduled. (Id.) He had a delayed effect and response time when completing tasks. (Id.) "He demonstrated an ability to follow simple directions, complete tasks that had 1-3 steps, and work at an appropriate speed while participating in the culinary arts and Sheltered Workshop assessments." (Id. at 204.) However, "[d]ue to [Plaintiff's] delayed response, physical limitations, difficulties with punctuality, difficulties working at a competitive speed, and following directions that required 1-3 steps, a recommendation for competitive employment [could] not be made." (Id.) Plaintiff had difficulty recalling past events, and demonstrated a delayed affect and response time. (Id. at 205.) Also, he had difficulty controlling his frustration, which he often became when confused about a task he was to complete. (Id.) He was below average in his ability to learn new concepts, correctly understand and use words, and do arithmetic. (Id.) He was average in his ability to visual two dimensional objects as three dimensional ones and to recognize differences in pictures, graphs, and written formats. (Id.) He was at a 5.6 grade level in reading comprehension, at a 3.7 grade level in total math, and at a 2.2 grade level in language. (Id.) When given three Valpar tests,[10] i.e., a small tools assessment, a multi-level sorting, and a whole body range of motion, he did not meet competitive employment standards due to the time he took to complete the tests. (Id. at 205, 209.)

_____

[10]Valpar tests are those developed by the Valpar International Corporation to measure work-related skills. See Valpar Company History, http://www.valparint.com/HISTORY.HTM (last visited Mar. 8, 2012).

In January 2008, Judith McGee, Ph.D., completed a PRTF for Plaintiff. (Id. at 396-407.) As before, one disorder, borderline intellectual functioning, was identified. (Id. at 396-97.) As before, this disorder was assessed as causing Plaintiff moderate limitations in the areas of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace and no episodes of decompensation of extended duration. (Id. at 404.)

Dr. McGee also completed a MRFCA of Plaintiff. (Id. at 393-95.) As before, in the three abilities in the area of understanding and memory, Plaintiff was not significantly limited in two and was moderately limited in one, i.e., his ability to understand and remember detailed instructions. (Id. at 393.) In the area of sustained concentration and persistence, Plaintiff was not significantly limited in five of the eight abilities and was moderately limited in two, i.e., his abilities to carry out detailed instructions and to maintain attention and concentration for extended periods. (Id. at 393-94.) In the area of social interaction, Plaintiff was found not to be significantly limited in the same three abilities as before and to be moderately limited in the remaining two. (Id. at 394.) And, again, he was not significantly limited in any of the four abilities listed in the area of social interaction. (Id.)

## The ALJ's Decision

Noting that Plaintiff had received SSI as a child based on mental retardation, that the benefits had been terminated after he was eighteen years old based on a finding that, as an adult, he was no longer disabled, and that Plaintiff had alleged a disability onset date in

November 2005, the ALJ determined that there was no reason to treat Plaintiff's applications as a child's case.[11]  (Id. at 14.)

Next, the ALJ determined that Plaintiff had a sparse work record with low earnings. (Id. at 15.)  He had no past relevant work.  (Id. at 16.)  After summarizing the medical records and the records of his vocational evaluation, the ALJ concluded that there was "no persuasive medical reason why [Plaintiff] could not perform jobs at any and all levels of exertion, so long as they did not require more than simple, repetitive unskilled or low level semi-skilled tasks, or close or frequent contact with co-workers, supervisors or the general public; or the seizure-related restrictions noted by Dr. Brown and others."  (Id. at 16-17.)  According to the VE, Plaintiff could perform jobs as a janitor, assembler, and hand packager with his restrictions. (Id. at 17.)

Referring to Dr. Rexroat's findings, the ALJ further determined that Plaintiff had below average intelligence but was not retarded.  (Id. at 18.)  He noted that there was no evidence that Plaintiff was unable to do the jobs he had or that he had frequent anger outbursts and could not "get along with most people most of the time."  (Id.)  Although there were references to depression, there was no evidence of chronic, uncontrolled depression and no prescriptions for any anti-depressants.  (Id.)

The ALJ then found:

_____

[11]The ALJ also noted that Plaintiff had previously applied for DIB and SSI in August 2006, alleging a disability beginning in December 1991, but had not pursued the matter after the applications were initially denied in November 2006.  (Id. at 16.)

[Plaintiff's] basic abilities to think, understand, communicate, concentrate, get along with other people, and handle normal work stress have never been significantly impaired on any documented long-term basis.  There has been no documented serious deterioration in his personal hygiene or habits, daily activities or interests, effective intelligence, reality contact, thought processes, memory, speech, mood and affect, attention span, insight, judgment, or behavior patterns over any extended period of time.  [Plaintiff] has never been described as suicidal or psychotic.  He has required no psychiatric hospitalization or similar drastic intervention.  [Plaintiff] has had no long-term or sustained corse of mental health treatment from a psychiatrist, psychologist, or other mental health professional as might be expected of someone with a genuinely severe chronic mental impairment.  At the hearing, he displayed no obvious sings of depression, anxiety, memory loss, or other mental disturbance.  The undersigned does not find [Plaintiff] to have any credible, medically-established mental or mood disorder that would prevent him from doing ordinary work, including the jobs identified by the [VE]. . . .

[Plaintiff's] allegation of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of all sustained work activity is not credible.  The statements by the other witnesses are also not proof of disability.  First, these persons are not medically trained to make exacting clinical determinations and observations concerning dates, frequencies, or types and degrees of medical signs and symptoms, or the frequency and intensity of certain moods and mannerisms.  Second, their statements were undoubtedly influenced somewhat by their affection towards [Plaintiff] and natural tendency to believe and support him.  Third, and most important, their statements, like [Plaintiff's] were inconsistent with the preponderance of the opinions and observations by qualified medical personnel in this case.  What a claimant alleges or displays to a lay third party, even to a . . . parent, or . . . other close relation, may not be indicative of a true maximum level of physical or mental functioning.  [Plaintiff's] mother even admitted that his seizures are not that frequent.

(Id. at 18-19.)

The ALJ found that Plaintiff did not have a mental impairment or combination of mental impairments that met or medically equaled an impairment of listing-level severity.  (Id. at 19.)  Specifically, he had only mild restrictions of mental activities of daily living and no

- 21 -

more than moderate limitations in social functioning.  (Id.) "He ha[d] no marked deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner in work settings or elsewhere so long as []he restricts [himself] to simple, repetitive tasks."  (Id.) "There [were] no repeated episodes of decompensation resulting in a total or extreme loss of adaptive functioning."  (Id.)  Accordingly, Plaintiff had no more than a moderate limitation in his ability to perform basic work activities.  (Id.)

Plaintiff had borderline intellectual functioning and a seizure disorder and probable mild depression controlled by medication.  (Id. at 20.)  He did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity.  (Id.)  He had the RFC to perform the physical exertional and nonexertional requirements of work except for climbing ropes, ladders, or scaffolds; working at unprotected heights or around dangerous machinery or open flames; driving as a part of work duties; doing more than simple repetitive tasks; or having more than infrequent contact with co-workers, supervisors, or the general public.  (Id.)  Examples of jobs he could perform with his RFC were janitor, assembler, and hand packager.  (Id. at 20-21.)  He was not, therefore, disabled within the meaning of the Act.  (Id. at 21.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of

such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R.

§ 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted).  Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

    In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'"  **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'"  **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524).  After considering these

factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred when assessing his RFC. Specifically, the ALJ improperly (1) disregarded his early IQ scores reflecting mild mental retardation and failed to

discuss the discrepancy between those scores and the ones achieved during Dr. Rexroat's testing and (2) disregarded Dr. Rexroat's assessment that he had marked limitations in the domain of interacting with others.  The Commissioner disagrees.

Plaintiff had two intelligence tests when he was five years old.  His scores on one, the WPPSI, placed him in the borderline range of intellectual functioning.  His score of 60 on the other, the Leiter International Performance Scale, placed him in the mildly retarded range of functioning.[12]  Title 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(10) provides that "IQ test results obtained before the age of 7 are current for . . . 1 year if at 40 or above."  Consequently, regardless of whether the WPPSI or the Leiter is the more accurate IQ test, Plaintiff's scores on either were valid only for one year.  Although a reference is made in Plaintiff's IEP when he was ready to graduate from high school to his IQ scores on the WISC-R placing him in the mentally deficient range, there are no records of the actual scores or of the age when Plaintiff took the test.  See Id. (providing that IQ results obtained between the ages of 7 and 16 should be considered current for two years if at 40 or above).  Plaintiff's scores on the WAIS-III,[13] taken when he was 27, place him in the borderline range.  "IQ test results obtained at age 16 or older should be viewed as a valid indication of [a claimant's] current status, provided they are compatible with the [claimant's] current behavior."  Id.  See also **Muncy v. Apfel**, 247 F.3d

---

[12]The Court notes that the WPPSI includes both verbal and nonverbal sections and the Leiter includes only non-verbal.  In a test yielding verbal, performance, and full scale IQs, such as the WPPSI, the lowest result is "determinative of impairment severity."  SSR 82-54, 1982 WL 31381, *3 (1982).  Accord 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(9).

[13]The Court notes that the WAIS-III test is an acceptable tests to determine a claimant's IQ.  See **Bailey v. Apfel**, 230 F.3d 1063, 1065 (8th Cir. 2000) (referring to the predecessor test, WAIS-R, which was given to Plaintiff when in school).

728, 734 (8th Cir. 2001) ("[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning.").

Thus, the ALJ had before him scores on two IQ tests that were no longer valid, a description of Plaintiff's intellectual functioning based on another IQ test score that may no longer be valid, and his scores on an IQ test administered by a consultative examiner. Moreover, contrary to Plaintiff's assertion, the ALJ did explain, see Record at 18 n.1, why he was citing the childhood IQ scores when finding Plaintiff was not retarded.

Plaintiff further argues that the ALJ erred when disregarding Dr. Rexroat's finding that he had a marked limitation in the domain of interacting with others. "Generally, if a consulting physician examines a claimant only once, [as did Dr. Rexroat], his or her opinion is not considered substantial evidence . . . ." **Charles v. Barnhart**, 375 F.3d 777,  783 (8th Cir. 2004); accord **Clark v. Apfel**, 141 F.3d 1253, 1256 (8th Cir. 1998).

The Commissioner cites various reasons why Dr. Rexroat's assessment of Plaintiff's ability to function socially is not entitled to controlling weight.  For instance, the Commissioner cites Plaintiff being able to work part-time in the fast food industry for five years and to have a girlfriend as belying Dr. Rexroat's assessment.  This citation is unavailing.  Plaintiff was fired from his job at McDonald's after three years.  According to his mother, he quit one of the two other jobs because his girlfriend asked him to and quit the second job because he had no transportation.  As noted by the ALJ, Plaintiff's earnings from these jobs were low.  And, although Plaintiff clearly had a girlfriend at one point, he was also got into an altercation with a girlfriend.  On the other hand, Plaintiff's kindergarten teacher noted that his socialization

- 28 -

skills were low and none of his activities involve any friends or, with the exception of helping his mother run a Bingo game, any groups.[14]

The Commissioner also notes that Dr. Rexroat's assessment of Plaintiff's socializing skills is inconsistent with his GAF rating indicating *some* difficulty in social functioning.  See note 9, supra.  Of course, the opposite is equally accurate – the GAF rating is inconsistent with Dr. Rexroat's assessment of Plaintiff having marked limitations in social functioning.  Which inconsistency is the more applicable is unexplained by the ALJ.  Indeed, the ALJ did not explain any reason for discounting Dr. Rexroat's assessment of Plaintiff's socializing skills.  Absent such explanation, the Court cannot determine whether the ALJ discounted the assessment for reasons supported by the record or overlooked it.

For the foregoing reasons, the case must be remanded to the Appeals Council with directions to remand it to an ALJ for a determination of what weight to give Dr. Rexroat's assessment of Plaintiff's social functioning abilities and, if necessary, to incorporate a marked limitation in those abilities in a hypothetical question to a VE.[15]

---

[14]The Court notes that Plaintiff testified he walks to a friend's house once a week.  None of his described activities involve friends, however, nor did the ALJ inquire further about Plaintiff's socialization skills.

[15]The Court notes that there is no argument that the limitations in the RFC found by the ALJ on Plaintiff's ability to have more than infrequent contact with co-workers, supervisors, or the general public are consistent with a marked limitation in the domain of social functioning.

**Conclusion**

Plaintiff may not be disabled within the meaning of the Act.  The ALJ failed, however, to explain why he discounted one assessment by Dr. Rexroat while accepting others as a result of the same consultative examination.   Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED for further proceedings as set forth above pursuant to sentence four of 42 U.S.C. § 405(g).

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  20th  day of March, 2012.